UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF PENNSYLVANIA

_____

ROBERT D. SCHLAYACH, Individually  :
and as the Administrator of the ESTATE  :
OF KATHERINE E. SCHLAYBACH,  :
Deceased,  :
                    Plaintiff,  :
                        :
            v.  :          No. 5:19-cv-3044
                        :
BERKS HEIM NURSING &  :
REHABILITATION; COUNTY OF  :
BERKS; COUNTY OF BERKS, BERKS  :
HEIM NURSING & REHABILITATION;  :
and TERRENCE J. BRENNAN,  :
                Defendants.  :

_____

**O P I N I O N**
**Defendants' Motion to Dismiss for Failure to State a Claim—GRANTED**

**Joseph F. Leeson, Jr.**                               **January 22, 2020**
**United States District Judge**

## I.      INTRODUCTION

This case arises out of the death of Katherine E. Schlaybach ("the decedent"), a resident

of Berks Heim Nursing and Rehabilitation, a nursing home owned and managed by Berks

County, Pennsylvania.  Plaintiff, Robert D. Schlaybach, Individually and as the Administrator of

the Estate of Katherine E. Schlaybach, Deceased ("Plaintiff"), contends the acts and omissions of

Defendants Berks Heim Nursing and Rehabilitation ("the facility"), the County of Berks ("the

County"), and Terrence Brennan ("Brennan"), the facility's administrator, resulted in the

decedent suffering a fall and subsequently passing away.  Plaintiff asserts claims for negligence

and wrongful death, as well a claim for violation of the decedent's federal constitutional and

statutory rights.

Defendants move to dismiss the Second Amended Complaint ("SAC"), ECF No. 7, pursuant to Federal Rule of Civil Procedure 12(b)(6) for failure to state a viable claim. *See generally* Defs.' Mem., ECF No. 9. For the reasons set forth below, Defendants' motion to dismiss the SAC is granted, and the SAC is dismissed.

## II.  BACKGROUND

### A.  Facts Alleged in the Second Amended Complaint

The following facts are drawn from the SAC and are accepted as true, with all reasonable inferences drawn in Plaintiff's favor. *See Lundy v. Monroe Cty. Dist. Attorney's Office*, No. 3:17-CV-2255, 2017 WL 9362911, at *1 (M.D. Pa. Dec. 11, 2017), *report and recommendation adopted*, 2018 WL 2219033 (M.D. Pa. May 15, 2018). Importantly, the following recitation does not include conclusory assertions or legal contentions. Although both are prevalent in the SAC, neither need be considered by the Court in determining the viability of Plaintiff's claims. *See Brown v. Kaiser Found. Health Plan of Mid-Atl. States, Inc.*, No. 1:19-CV-1190, 2019 WL 7281928, at *2 (M.D. Pa. Dec. 27, 2019).

The SAC avers that Defendants held themselves out as specialists in the field of adult nursing care with the expertise necessary to maintain the health and safety of persons unable to care for themselves. SAC ¶ 13. As a result, the decedent was transferred into the Defendants' care on April 27, 2017, where she remained until the fall which resulted in her death. *Id*. ¶¶ 12, 15. At the time the decedent was transferred to their care, Defendants knew she suffered from Alzheimer's disease, dementia, and ambulation dysfunction, and required assistance with all of her daily functions. *Id*. ¶¶ 17-18. This included one person for assistance when the decedent would attempt to stand or walk. *Id*. ¶ 18. According to the SAC, despite knowing that the decedent required fall-prevention alarms in order to avoid foreseeable and preventable falls,

Defendants failed to utilize such alarms, and generally failed to utilize basic fall-prevention measures. *Id.* ¶¶ 19, 21.

In June 2017, the decedent began demonstrating increased restlessness and unassisted attempts to stand from her wheelchair. SAC ¶ 20. On July 3 and 5, 2017, she attempted to stand from her wheelchair unassisted. *Id.* ¶ 22. On July 6, 2017, at approximately 6:41 p.m., the decedent stood up from her wheelchair and fell onto the floor, injuring herself. *Id.* ¶ 24. The SAC contends that basic fall-prevention measures were not in place at the time of the decedent's fall. *Id.* ¶¶ 23-24. Immediately after her fall, the decedent complained of pain in her right hip and leg. *Id.* ¶ 25. According to the SAC, instead of taking reasonable action to evaluate her condition or seek appropriate medical treatment, Defendants simply placed the decedent in her bed. *Id.* ¶¶ 25-26.

Throughout the night, the decedent continued to express pain in her right leg. SAC ¶ 27. At 2:31 a.m. on July 7, 2017, Defendants' nursing staff evaluated the decedent and noticed that her right leg was larger than her left leg and that Tylenol given for pain was ineffective. *Id.* ¶ 28. Despite this observation, according to the SAC, Defendants failed to properly document her declining condition, and failed to contact a physician or seek appropriate medical treatment for the decedent until approximately 10:00 a.m. *Id.* ¶¶ 29-30. At that time, emergency medical personnel arrived at the facility and transported the decedent to the emergency room at Reading Hospital. *Id.* ¶¶ 30-31. It was there she was diagnosed with a right hip fracture and significant gastrointestinal bleeding. *Id.* ¶ 31. On July 10, 2017, the decedent passed away. *Id.* ¶ 32. The cause of her death was GI Bleeding, Hip Fracture, and Chronic Atrial Fibrillation. *Id.* ¶ 33.

Plaintiff avers that Defendants and their agents, officers, servants, and employees, failed, refused, and/or neglected to perform their duties to provide reasonable and adequate health care

to the decedent.  SAC ¶ 16.  Specifically, Defendants failed to update the decedent's plan of care when her medical condition indicated an ongoing and increasing risk of falls, failed to recognize the decline in her ability to safely ambulate and to assist her accordingly, and failed to recognize she was injured even after they knew she had fallen.  *Id.*  Their failure to fulfill their duties, according to the SAC, resulted in the decedent's death.  *Id.* ¶¶ 34-35, 41-44.

Plaintiff additionally alleges that the decedent's fall resulted from "dangerous and defective personal property as defined by 42 Pa. C.S. § 8542, specifically, the dangerous, defective, broken and/or inoperable wheelchair being used by [the decedent] . . . which failed to prevent [her] from standing and falling."  SAC ¶ 45.  Similarly, the SAC alleges that "[t]he records of Defendants were not complete and properly maintained by their staff and employees so as to accurately and completely disclose the condition of Plaintiff's Decedent and her health, symptoms[,] and other illness indications for evaluation and intervention."  *Id.* ¶ 47.

Based on these allegations—and many more which are not recited here owing to their conclusory nature—Plaintiff purports to assert the following causes of action:[1]  negligence, against all Defendants (Count I); violation of the decedent's federal civil rights pursuant to 42 U.S.C. § 1983, against all Defendants (Counts II and III); "vicarious liability," against all Defendants (Count IV); "corporate liability," against all Defendants (Count V); wrongful death, against all Defendants (Count VI); and a "survival action," against all Defendants (Count VII).  SAC ¶¶ 55-119.

---

[1]     In reciting the counts of the SAC here, the Court does not endorse them as stating proper or viable causes of action (as opposed to forms of liability, which several clearly do, as discussed below).

### B.       Procedural Background

Plaintiff filed the initial Complaint in this matter in the Berks County Court of Common Pleas on or about April 24, 2019.  *See* ECF No. 1.  On June 18, 2019, Plaintiff filed an Amended Complaint, which, unlike the initial Complaint, asserted federal causes of action.  *See* ECF No. 9, Ex. A.  On July 12, 2019, the case was removed to this Court.  *See* ECF No. 1.  Shortly thereafter, on July 22, 2019, this Court approved a stipulation allowing Plaintiff to file a (second) Amended Complaint, which was subsequently filed on August 8, 2019, and modified on August 9, 2019.  *See* ECF Nos. 5-7.  The Second Amended Complaint remains the operative pleading in this case.  On August 22, 2019, Defendants filed the instant motion to dismiss.  *See* ECF No. 9. Plaintiff filed a response in opposition to the motion on September 5, 2019, *see* ECF No. 10, and Defendants filed a reply in further support of their motion on September 12, 2019, *see* ECF No. 11.

## III.    STANDARD OF REVIEW

In *Ashcroft v. Iqbal*, 556 U.S. 662 (2009), the Supreme Court clarified the appropriate civil action pleading standard and set forth a two-step approach to be utilized in deciding a motion to dismiss brought under Federal Rule of Civil Procedure 12(b)(6) for failure to state a claim.  First, district courts are to "identify [ ] pleadings that, because they are no more than conclusions, are not entitled to the assumption of truth."  *Id.* at 679; *see id.* at 678 ("A pleading that offers 'labels and conclusions' or 'a formulaic recitation of the elements of a cause of action will not do.'" (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007))); *Thourot v. Monroe Career & Tech. Inst.*, No. CV 3:14-1779, 2016 WL 6082238, at *2 (M.D. Pa. Oct. 17, 2016) (explaining that "[a] formulaic recitation of the elements of a cause of action" alone will not survive a motion to dismiss).  Though "legal conclusions can provide the framework of a

complaint, they must be supported by factual allegations." *Iqbal*, 556 U.S. at 679. Second, if a

complaint contains "well-pleaded factual allegations, a court should assume their veracity and

then determine whether they plausibly give rise to an entitlement to relief." *Id*. "A claim has

facial plausibility when the plaintiff pleads factual content that allows the court to draw the

reasonable inference that the defendant is liable for the misconduct alleged." *Id*. at 678. This

standard, commonly referred as the "plausibility standard," "is not akin to a 'probability

requirement,' but it asks for more than a sheer possibility that a defendant has acted unlawfully."

*Id*. (citing *Twombly*, 550 U.S. at 556-57). It is only where the "[f]actual allegations . . . raise a

right to relief above the speculative level" that the plaintiff has stated a plausible claim.[2] *Phillips*

*v. Cty. of Allegheny*, 515 F.3d 224, 234 (3d Cir. 2008) (quoting *Twombly*, 550 U.S. at 555).

The Court's task then in deciding a motion to dismiss for failure to state a claim is to

determine whether, based upon the facts as alleged, which are taken as true, and disregarding

legal conclusions and conclusory assertions, the complaint states a claim for relief that is

plausible on its face. *Iqbal*, 556 U.S. at 679; *Ashford v. Francisco*, No. 1:19-CV-1365, 2019 WL

4318818, at *2 (M.D. Pa. Sept. 12, 2019) ("To avoid dismissal under Rule 12(b)(6), a civil

complaint must set out sufficient factual matter to show that its claims are facially plausible.").

The scope of what a court may consider in adjudicating a Rule 12(b)(6) motion is

necessarily constrained: a court may "consider only the complaint, exhibits attached to

the complaint, matters of public record, as well as undisputedly authentic documents if the

---

[2]     As the Supreme Court counseled, "[d]etermining whether a complaint states a plausible
claim for relief . . . [is] a context-specific task that requires the reviewing court to draw on its
judicial experience and common sense." *Iqbal*, 556 U.S. at 679.

complainant's claims are based upon these documents."[3] *United States v. Gertsman*, No. 15-8215, 2016 WL 4154916, at *3 (D.N.J. Aug. 4, 2016) (quoting *Guidotti v. Legal Helpers Debt Resolution, L.L.C.*, 716 F.3d 764, 772 (3d Cir. 2013)).

## IV. ANALYSIS

As an initial matter, the Court must address the Pennsylvania Political Subdivision Tort Claims Act, 42 PA. CONST. STAT. § 8541. That statute provides that, but for several exceptions, "no local agency shall be liable for any damages on account of any injury to a person or property caused by any act of the local agency or an employee thereof or any other person." *Id.* "Under the terms of the statute, local agencies are immune from suits alleging medical malpractice or the negligence of employees in municipally owned health care facilities." *Kranson v. Valley Crest Nursing Home*, 755 F.2d 46, 52 (3d Cir. 1985). Both the facility, Berks Heim Nursing & Rehabilitation, and the County, which owns and operates the facility, fall within the scope of "local agency" as that term is defined in the statute.[4] *See* 42 PA. CONST. STAT. § 8501; *Kranson*, 755 F.2d at 53. Moreover, none of the statutory exceptions to immunity apply here.[5] *See* 42 PA. CONST. STAT. § 8542(b). It follows that Plaintiff's claim for negligence cannot succeed, and this

---

[3] Additionally, a court adjudicating a Rule 12(b)(6) motion may take judicial notice of certain undisputed facts. *See Devon Drive Lionville, LP v. Parke Bancorp, Inc.*, No. CV 15-3435, 2017 WL 5668053, at *9 (E.D. Pa. Nov. 27, 2017).

[4] Although Plaintiff does not explicitly plead it, the Court takes judicial notice of the fact that Berks Heim Nursing & Rehabilitation is owned and operated by Berks County, Pennsylvania. *See Moyer v. Berks Heim Nursing Home*, No. 13-CV-4497, 2014 WL 1096043, at *1 (E.D. Pa. Mar. 20, 2014). Moreover, there are no allegations against the individual Defendant, Terrence J. Brennan, that would support a claim for liability against him in his individual, rather than official capacity. The suit against Brennan in his official capacity is no different than the suit against the municipal Defendants. *See Whaumbush v. City of Philadelphia*, 747 F. Supp. 2d 505, 510 n.2 (E.D. Pa. 2010).

[5] Section 8542(b) waives immunity for vehicle liability, liability arising from the care, custody, or control of personal property, real property, trees, traffic controls and street lighting, utility service facilities, streets, sidewalks, animals, and liability arising from sexual abuse.

claim is dismissed accordingly. *See Moyer v. Berks Heim Nursing Home*, No. 13-CV-4497, 2014 WL 1096043, at *5 (E.D. Pa. Mar. 20, 2014) ("The parties do not contest that Berks County and Berks Heim Nursing Home are immune from claims of medical malpractice."); *Kranson*, 755 F.2d at 53 (upholding a county-run nursing home's immunity from negligence liability under Section 8541). Plaintiff's claim brought under Pennsylvania's wrongful death statute is similarly defeated by immunity.[6] *See Panas v. City of Philadelphia*, 871 F. Supp. 2d 370, 376 (E.D. Pa. 2012) ("[T]he Tort Claims Act [ ] bars Plaintiffs' wrongful death . . . claim[ ] against the City.").

Pennsylvania's Tort Claims Act does not, however, immunize local agencies against constitutional torts, and Plaintiff's claim brought pursuant to 42 U.S.C. § 1983 is therefore not affected by Section 8541. *Thomas v. Cty. of Chester, Pocopson Home*, 312 F. Supp. 3d 448, 453 n.26 (E.D. Pa. 2018) ("[T]he PSTCA does not affect § 1983 claims."). This claim, which appears in Counts II and III of the SAC, is the only other substantive cause of action asserted by Plaintiff beyond his claims for negligence and wrongful death. Indeed, Counts IV, V, and VII— titled "vicarious liability," "corporate liability," and "survival action," respectively—are not independent causes of action. Rather, they are bases for extending liability incident to a cause of action (in the case of vicarious and corporate liability), *see Jiminez v. All Am. Rathskeller, Inc.*, No. 4:04-CV-1897, 2005 WL 8167979, at *12 (M.D. Pa. Apr. 1, 2005) ("Vicarious liability is not a cause of action in and of itself, but allows for a party to be liable for the negligent actions of another party."), or the continuation of a right of action which accrued to the deceased at

---

[6] A wrongful death claim is a claim for "damages sustained by the plaintiff by reason of the decedent's death," to succeed on which a plaintiff must establish "that the defendants were negligent with respect to the care of [the decedent]." *Donlan v. Ridge*, 58 F. Supp. 2d 604, 607-08 (E.D. Pa. 1999).

common law (in the case of a survival action), *see Donlan v. Ridge*, 58 F. Supp. 2d 604, 607-08 (E.D. Pa. 1999) (explaining that "unlike a wrongful death action," a survival action "is not a new cause of action, but merely continues in the personal representative the right of action which accrued to the deceased at common law"). The Court therefore turns to addressing the viability of Plaintiff's Section 1983 claim.

Although Counts II and III of the SAC are each titled "civil rights action pursuant to 42 U.S.C. § 1983," they do not appear to allege distinct bases for Section 1983 liability. Rather, the heart of Plaintiff's Section 1983 claim appears to be based on Defendants' alleged failure "to establish adequate policies for training and supervision of medical and nursing staff to implement federal and state statutory regulatory requirements," or, if such policies were in place, Defendants' failure to prevent "a pattern and practice of their violation by employees."[7] SAC ¶ 69. The Court analyzes Plaintiff's Section 1983 claim with this construction in mind.

### A. Legal Principles: 42 U.S.C. § 1983 and Municipal Liability

Title 42 U.S.C. § 1983 provides as follows:

> Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any state . . . subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress . . . .

Section 1983 "is not itself a source of substantive rights"; rather, the statute is a "method for vindicating federal rights elsewhere conferred by those parts of the United States Constitution and federal statutes that it describes." *Baker v. McCollan*, 443 U.S. 137, 145 n.3 (1979);

---

[7] Admittedly, the Court's ability to determine the alleged basis (or bases) for Section 1983 liability is made difficult by the length and nature of the SAC as to this claim—for example, Count II of the SAC contains approximately 70 paragraphs and subparagraphs filled with largely conclusory and repetitive language.

*Grammer v. John J. Kane Reg'l Centers-Glen Hazel*, 570 F.3d 520, 525 (3d Cir. 2009)

(explaining that Section 1983 "is a vehicle for imposing liability against anyone who, under

color of state law, deprives a person of 'rights, privileges, or immunities secured by the

Constitution and laws'" (quoting *Maine v. Thiboutot,* 448 U.S. 1, 4-6 (1980))); *see Three Rivers*

*Ctr. for Indep. Living v. Hous. Auth. of City of Pittsburgh*, 382 F.3d 412, 422 (3d Cir. 2004)

("Once the plaintiff establishes the existence of a federal right, there arises a rebuttable

presumption that the right is enforceable through the remedy of § 1983.").  To state a viable

claim pursuant to Section 1983, a plaintiff must allege "two essential elements: (1) that the

conduct complained of was committed by a person acting under color of state law; and (2) that

the conduct deprived the plaintiff of rights, privileges, or immunities secured by the Constitution

or laws of the United States."  *Schneyder v. Smith*, 653 F.3d 313, 319 (3d Cir. 2011) (citing *Kost*

*v. Kozakiewicz,* 1 F.3d 176, 184 (3d Cir. 1993)).

    Because Defendants in this matter—a county-run nursing home, its administrator, and the

county-owner/operator — are "municipal" entities,[8] the Court must address the scope and nature

of municipal liability in the context of Section 1983.  In *Monell v. Dep't of Soc. Servs. of City of*

*New York*, 436 U.S. 658 (1978), the Supreme Court overruled its holding in *Monroe v. Pape* that

"Congress did not undertake to bring municipal corporations within the ambit of [§ 1983]."[9] 365

U.S. 167, 187 (1961).  Since *Monell*, it has been well settled that local governments can be liable

as "persons" under Section 1983; however, this liability extends only to "their *own* illegal

---

[8]    Local governments, whether of counties, towns, cities, or villages, are generally
considered to be "municipal corporations" in the context of Section 1983.  *See, e.g*., *Reitz v. Cty.*
*of Bucks*, 125 F.3d 139, 144 (3d Cir. 1997).

[9]    In reversing course from its decision in *Pape*, the Court in *Monell* stated as follows:
"[o]ur analysis of the legislative history of the Civil Rights Act of 1871 compels the conclusion
that Congress *did* intend municipalities and other local government units to be included among
those persons to whom § 1983 applies."  436 U.S. at 690 (emphasis in original).

acts." *Connick v. Thompson*, 563 U.S. 51, 60 (2011) (emphasis in original) (quoting *Pembaur v. Cincinnati,* 475 U.S. 469, 479 (1986)); *see Monell,* 436 U.S., at 665-83. This limitation is a corollary of the established principle that municipalities "are not vicariously liable under § 1983 for their employees' actions." *Connick*, 563 U.S. at 60; *Monell*, 436 U.S. at 691 ("[A] municipality cannot be held liable *solely* because it employs a tortfeasor—or, in other words, a municipality cannot be held liable under § 1983 on a *respondeat superior* theory.") (emphasis in original).

To avoid Section 1983 municipal liability collapsing into vicarious liability, a Section 1983 plaintiff seeking to recover against a municipality must, in the context of a Rule 12(b)(6) motion to dismiss, plead that the complained-of injury was caused directly by a local government's "policy or custom, whether made by its lawmakers or by those whose edicts or acts may fairly be said to represent official policy."[10] *Harris v. City of Philadelphia*, 171 F. Supp. 3d 395, 400 (E.D. Pa. 2016) (quoting *Monell*, 436 U.S. at 694). That is to say, a municipal policy or custom—as opposed to the independent conduct of a municipal employee—must be the "driving force" behind the alleged harm. *Weston v. City of Philadelphia*, 82 F. Supp. 3d 637, 649 (E.D. Pa. 2015). In this context, a municipal "[p]olicy is made when a decision maker possessing final authority to establish municipal policy with respect to the action issues an official proclamation, policy, or edict." *Does v. Se. Delco Sch. Dist.*, 272 F. Supp. 3d 656, 667 (E.D. Pa. 2017) (quoting *Kneipp v. Tedder*, 95 F.3d 1199, 1212 (3d Cir. 1996)). A municipal custom, on the other hand, "is established 'by showing that a given course of conduct although

---

[10]     A viable Section 1983 claim requires the existence of "a direct causal link between a municipal policy or custom and the alleged constitutional deprivation." *Id.* (quoting *City of Canton v. Harris*, 489 U.S. 378, 385 (1989)).

not specifically endorsed or authorized by law, is so well-settled and permanent as virtually to constitute law.'" *Kelty v. City of Philadelphia*, No. CV 16-0306, 2016 WL 8716437, at \*3 (E.D. Pa. June 10, 2016) (quoting *Bielevicz v. Dubinon*, 915 F.2d 845, 850 (3d Cir. 1990)).

Courts have generally recognized four sets of circumstances the existence of which are sufficient to establish a municipal policy or custom for purposes of Section 1983 liability: (1) a formal policy officially promulgated or endorsed by the municipality, *see* Monell, 436 U.S. at 690; (2) notwithstanding the absence of a formal policy, specific injury-causing actions taken by a government official who is responsible for establishing municipal policies, *see Bd. of County Comm'rs v. Brown,* 520 U.S. 397, 404-05 (1997); *Pembaur*, 475 U.S. at 483; (3) notwithstanding the absence of a formal policy, a practice so consistent and widespread that, although not expressly authorized, constitutes a custom or usage of which a policymaker must have been aware, *see Bd. of County Comm'rs,* 520 U.S. at 403-04; *City of St. Louis v. Praprotnik,* 485 U.S. 112, 127 (1988); *Monell,* 436 U.S. at 690-91; and (4) notwithstanding the absence of a formal policy, a widespread failure by policymakers to provide adequate training or supervision to subordinates, *see Bd. of County Comm'rs,* 520 U.S. at 407; *City of Canton v. Harris,* 489 U.S. 378, 388 (1989).

As observed previously, Plaintiff is primarily pleading municipal liability based on a failure to provide adequate training or supervision to Defendants' staff—the fourth basis identified above. Where an allegedly injurious policy "concerns a failure to train or supervise municipal employees, liability under section 1983 requires a showing that the failure amounts to 'deliberate indifference' to the rights of persons with whom those employees will come into contact." *Thomas v. Cumberland Cty.*, 749 F.3d 217, 222 (3d Cir. 2014) (quoting *Carter v. City of Phila.,* 181 F.3d 339, 357 (3d Cir. 1999)). "'[D]eliberate indifference' is a stringent standard

of fault, requiring proof that a municipal actor disregarded a known or obvious consequence of his action." *Bd. of Cnty. Comm'rs of Bryan Cnty.*, 520 U.S. at 410. "A pattern of similar constitutional violations by untrained employees is 'ordinarily necessary' to demonstrate deliberate indifference for purposes of failure to train." *Connick*, 563 U.S. at 62 (quoting *Bd. Of Cnty. Comm'rs of Bryan Cty.,* 520 U.S. at 409). Such a pattern of behavior is necessary to put municipal policymakers on notice that a new program is required; through continued adherence to a policy they know or should know violates the rights of others, they demonstrate deliberate indifference. *Thomas*, 749 F.3d at 223. As the Supreme Court has observed, a lesser standard of fault for failure-to-train claims brought pursuant to Section 1983 "would result in *de facto respondeat superior* liability on municipalities"—a result the Court explicitly rejected in *Monell*. *City of Canton*, 489 U.S. at 392.

###### B.     Application to Plaintiff's Allegations

Defendants argue the SAC is devoid of any specific factual allegations which would establish "a crucial aspect of [Plaintiff's] § 1983 claim, namely, a 'pattern of similar constitutional violations by untrained employees.'" Defs.' Mem. at 10 (emphasis in original). The Court agrees. There simply are no facts alleged in the SAC which, taken as true, would establish that the decedent's death was not an unfortunate, isolated incident, let alone that Defendants exhibited a pattern of behavior similar to that which allegedly led to the decedent's death.

Although subparagraphs (a) – (q) of paragraph 64 purport to provide specific allegations as to how Defendants "failed to provide proper staffing, training and supervision," the allegations contained in these subparagraphs are inherently conclusory. Subparagraphs (a) – (q) of paragraph 64 appear in full as follows:

a.	The repeated, systematic and ongoing failure to provide sufficiently staffed, trained and supervised staff to meet the fundamental needs of Plaintiff's decedent including adequate training and supervision to properly evaluate her risk of falls;

b.	 The repeated, systematic and ongoing failure to properly staff, train and supervise medical and nursing staff to monitor, observe and assess the medical condition of Plaintiff's decedent prior to her fall and after her fall;

c.	The repeated, systematic and ongoing failure to adequately staff/hire and train appropriate and licensed medical and nursing personnel to properly monitor, supervise, evaluate and treat Plaintiff's Decedent even after Defendants' knew that she suffered a serious fall and required emergency medical treatment;

d.	The repeated, systematic and ongoing retention of and assignment of unfit, unqualified, insufficient and incompetent direct care staff, specifically the use of nurses to do assessments, diagnoses and other acts outside of their scope of practice and without training or supervision in violation of the Pennsylvania Nurse Practices Act and the Medicare Act;

e.	The repeated, systematic and ongoing failure to have sufficient numbers of trained and supervised staff to provide medical, nursing and related services to attain or maintain the highest practicable mental, physical and psychosocial well-being to Plaintiff's decedent;

f.	The repeated, systematic and ongoing failure to provide 24-hour nursing services from enough qualified, trained and supervised nursing personnel to meet the total nursing needs of Plaintiff's decedent;

g.	The repeated, systematic and ongoing failure to assure that nursing personnel staffing, including registered nurses, certified nurse's aides and licensed practical nurses, was sufficiently trained and supervised to provide 24-hour nursing service, and was increased whenever necessary, to assure that Plaintiff's decedent was protected from harm, injury and neglect and to enhance her quality of life, dignity and safety;

h.	The repeated, systematic and ongoing failure to provide adequately trained and supervised medical and nursing staff to prevent Plaintiff's decedent from suffering pain and death as a result of a preventable fall and as a result of Defendants failing to properly examine and evaluate the medical condition of Plaintiff's decedent after her fall, which proper examination would have revealed that her hip was fractured and that she was suffering a gastrointestinal bleed, and as a result of Defendants intentional refusal to obtain emergency medical care for Plaintiff's decedent;

i.	The repeated, systematic and ongoing failure to provide adequate notification of changes in medical conditions to physicians;

j.      The repeated, systematic and ongoing failure to provide adequately trained and supervised medical staff to follow physicians' orders;

k.      The repeated, systematic and ongoing failure to comply with corporate budgeting policies which required sufficient funds for training and supervision of staff and physicians to be consistent with the number of residents and with the needs of residents including Plaintiff's decedent, whom Defendants had accepted and promised to care for;

l.      The repeated, systematic and ongoing failure to establish and/or provide training and supervision for the implementation and/or enforcement of appropriate corporate safety, training, staffing and fundamental nursing care and other policies to prevent harm to residents and to avoid the known consequences of inadequate care, including falls and failure to properly diagnose serious and life-threatening medical conditions resulting therefrom such as hip fractures.

m.      The repeated, systematic and ongoing failure to provide care for residents in a manner and in such an environment as will promote maintenance or enhancement of the quality of life of each resident, 42 U.S.C. § 1396r (b)(1)(A);

n.      The repeated, systematic and ongoing failure to provide services and activities to attain or maintain highest practicable physical, mental and psychological well-being of each resident in accordance with a written plan of care which (a) describes the medical, nursing and psychological needs of the resident and how such needs will be met. 42 U.S.C. §1396r (b)(2)(A);

o.      The repeated, systematic and ongoing failure to conduct a comprehensive, accurate, standardized reproducible assessment of each resident's functional capacity, which assessments (i) describe the resident's capability to perform daily life functions and significant impairments in functional capacity; (iv) including identification of medical problems; 42 U.S.C. § 1396r (b)(3)(A);

p.      The repeated, systematic and ongoing failure to provide services and activities to attain or maintain the highest practicable physical, mental, and psychological well-being of each resident in accordance with a written plan of care, and as appropriate, revise the resident's assessment to assure the continuing accuracy of the assessment, and the results thereof shall be used in developing, reviewing and revising the resident's plan of care; 42 U.S.C. § 1396r et seq.;

q.      The repeated, systematic and ongoing failure to maintain clinical records on all residents, which records include the plan of care as well as the results of any pre-admission screening; 42 U.S.C. § 1396r (B)(6)(c).

As is clear on their face, these allegations contain no substance.  That each of these

subparagraphs begins with the same language—"[t]he repeated, systematic and ongoing

failure"—further illustrates the conclusory nature of the allegations contained in each:

notwithstanding the repeated use of this language, there are simply no specific factual allegations

here indicating exactly *how* the complained-of conduct—failure to provide or perform in some

capacity—was "repeated, systematic and ongoing."[11]

Nor are there any allegations in any other part of the SAC that would provide specific

factual support for the conclusory assertion that Defendants engaged in a pattern of conduct that

was "repeated, systematic, and ongoing."  Although the SAC alleges that "family and resident[s]

complain[ed] of inadequate staffing and inadequate training and supervision of staff resulting in

failures of care," SAC ¶ 75, this is also a conclusory assertion and the only fleeting reference to

any sort of "complaints" having been made.  Without a single non-conclusory allegation

regarding other injurious conduct, Plaintiff is necessarily unable to allege "that in light of the

duties assigned to [Defendants' staff,] the need for more or different training [was] so obvious,

and the inadequacy so likely to result in the violation of constitutional rights, that the

policymakers of the [Defendants] can reasonably be said to have been deliberately indifferent to

the need."  *City of Canton v. Harris*, 489 U.S. 378, 390 (1989); *see Connick*, 563 U.S. at 62

(acknowledging that the existence of a "pattern" of behavior is "ordinarily necessary to

demonstrate deliberate indifference for purposes of failure to train"); *Harris v. City of*

*Philadelphia*, 171 F. Supp. 3d 395, 400 (E.D. Pa. 2016) ("[P]roof of a single incident of

---

[11]     Nor does Plaintiff do anything in his opposition papers to rebut the argument that these
allegations are inherently conclusory.  He simply states that the SAC "provides specific factual
support of Defendants' continuous, repeated and systematic conduct," and then reproduces the
conclusory allegations contained in paragraph 64(a) – (q).  *See* Pl.'s Opp'n, ECF No. 10, at 6-8.

unconstitutional activity is not sufficient to impose liability under *Monell*, unless proof of the incident includes proof that it was caused by an existing . . . municipal policy, which policy can be attributed to a municipal policymaker." (quoting *City of Oklahoma City v. Tuttle*, 471 U.S. 808, 823-24 (1985) (plurality opinion))); *see also Hope v. Fair Acres Geriatric Ctr.*, 174 F. Supp. 3d 880, 891 (E.D. Pa. 2016) (finding that general, conclusory allegations of insufficient training were unable to support a Section 1983 claim founded on deliberate indifference).

Decisions in which courts have found allegations sufficient to state a Section 1983 claim on a theory of deliberate indifference show how, in contrast, Plaintiff's SAC is deficient.  In *Robinson v. Fair Acres Geriatric Ctr.*, the Third Circuit found the plaintiff's allegations to be sufficient to support a claim based on deliberate indifference against a nursing home where, although the plaintiff "alleged only generally that training was inadequate, the inadequacy of training can be plausibly inferred from [the] allegations regarding the number and character of deficiency citations issued to [the nursing home] by federal and state regulators."  722 F. App'x 194, 199-200 (3d Cir. 2018).  The plaintiff  had alleged that the nursing home "was cited with 30 deficiencies in its patient care[, which] put the facility in the 97th percentile for number of deficiencies."  *Id*. at 200.  In *Thomas v. Cty. of Chester, Pocopson Home*, a court in this district found the plaintiff's allegations against a nursing home sufficient to support a Section 1983 claim based on deliberate indifference where the plaintiff alleged that the decedent "underwent dramatic weight loss in a six week period," that the nursing home "staff was aware of his weight loss, but refused to assist him with his meals or to develop a plan to ensure that he was eating and drinking enough," that "the staff simply recorded his lack of sustenance and concomitant decline," and that "[a]s a direct result of the alleged inaction, [the decedent] arrived at Chester County Hospital in a state of severe dehydration and malnutrition, and died less than a week

later." 312 F. Supp. 3d 448, 454 (E.D. Pa. 2018). In comparison to these cases, Plaintiff's

allegations here are distinctly barren, and do not support an inference that there existed a pattern

of conduct that violated the decedent's—or anyone else's—rights.

The SAC also alleges that Defendants' failure to follow "OBRA and FNHRA

regulations, which establish the minimum standard of care to be followed by Defendants . . .

violated the [decedent's] constitutional rights."[12]  SAC ¶ 65. Subparagraphs (a) – (w) of

paragraph 65 of the SAC purport to identify specific violations of applicable statutes and

regulations. They aver as follows:

> a.     A facility must immediately inform the resident and consult with the
> resident's physician when a significant change in the resident's physical, mental or
> psychological status occurs. The Defendants failed to inform Plaintiff's decedent,
> or her physician of her significant change in her physical condition as the result of
> her fall and hip fracture and instead simply placed Plaintiff's decedent in bed even
> after Defendants knew or should have known that her hip was broken in violation
> of 42 C.F.R. § 483.10 (b)(11)(i)(A);

---

[12]     OBRA is the Omnibus Budget Reconciliation Act of 1987, Pub. L. 100-203, 101 Stat. 1330 (1987). FNHRA is the Federal Nursing Home Reform Amendments, 42 U.S.C. § 1396r *et seq.* FNHRA is contained in OBRA. The Third Circuit explained their legislative origins as follows:

> This federal legislation comes by its common name "OBRA" through the
> legislative process. Congress, then and now, usually completes a huge measure of
> its budgetary and substantive work in one large bill. The bill accomplishing that
> function in 1987 was entitled the Omnibus Budget Reconciliation Act of 1987 or
> "OBRA '87." The separate Federal Nursing Home Reform Act together with many
> other separate bills were "rolled into" one bill to insure final passage of all the
> elements. Some courts have referred to the statutory provisions at issue herein as
> the Federal Nursing Home Reform "Act." *See e.g. Blue v. Koren,* 72 F.3d 1075 (2d
> Cir.1995). Other courts refer to these provisions collectively as the Federal Nursing
> Home Reform "Amendments." *See e.g. Grant ex rel. Family Eldercare v.
> Gilbert,* 324 F.3d 383 (5th Cir.2003). We find the designation "amendments" a
> more accurate reflection of the legislative history.

*Grammer v. John J. Kane Reg'l Centers-Glen Hazel*, 570 F.3d 520, 523 (3d Cir. 2009).

b.      A facility must ensure that all alleged violations involving mistreatment, neglect or abuse including injuries of unknown source, are immediately reported to the administrator of the facility and to other officials in accordance with state law through established procedures (including to the state survey and certification agency). The Defendants failed to notify the administrator and state officials that Plaintiff's decedent had suffered a fall due to the failure of Defendants to evaluate, document, update, maintain and confirm the use of fall protections, and placed her in bed instead of notifying the appropriate individual and instead of seeking immediate and emergency medical care in violation of 42 C.F.R. § 483.13 (c)(2);

c.      A facility must care for its residents in a manner and in an environment that promotes maintenance or enhancement of each resident's quality of life, and here the facility failed to do so by failing to take adequate measures to prevent the fall suffered by Plaintiff's decedent, and thereafter failed to obtain timely medical evaluation and emergency medical care for her broken h[i]p and gastrointestinal bleeding in violation of 42 C.F.R. § 483.20 (b)(1)(xii);

d.      The facility must make a comprehensive assessment of a resident's needs, using the resident assessment instrument (RAI) specified by the state, and here, the Defendants failed to do so in violation of 42 C.F.R. § 483.20 (b)(1)(xii);

e.      Each resident must receive, and the facility must provide, the necessary care and services to attain or maintain the highest practicable physical, mental, and psychosocial well-being, in accordance with the comprehensive assessment and plan of care; and here, Defendants failed to provide care and services which would have recognized the increasing risk that Plaintiff's decedent would suffer injuries and death as the result of a fall in violation of in violation of 42 C.F.R. § 483.25;

f.      The facility must have sufficient nursing staff to provide nursing and related services to attain or maintain the highest practicable physical, mental and psychosocial wellbeing of each resident, as determined by resident assessments and individual plans of care, and here the Defendants failed to do so by failing to provide staff necessary to properly monitor Plaintiff due to her increasing risk of falls in violation of 42 C.F.R. § 483.30;

g.      The facility must ensure that nurse aides are able to demonstrate competency in skills and techniques necessary to care for resident's needs, as identified through resident assessments and described in the plan of care. Defendants failed to ensure its nurses' aides were able to demonstrate competency and techniques necessary to care for Plaintiff's decedent's needs, which contributed to her suffering injuries in a preventable fall, her physical and mental decline, her pain and suffering and her death.

h.      The callous disregard for the known dangers caused by Defendants' systematic and continuous practice of under-training and under-supervising its staff and Defendants failure to comply with federal, state and local laws, as above

referenced, and failure to comply with professional standards as above referenced caused and/or contributed to Plaintiffs' fall, injuries and death;

i.      By failing, as a custom and policy, to care for patients like Katherine Schlaybach, in a manner that promoted maintenance or enhancement of her life as required by 42 C.F.R. §483.15 and 42 U.S.C. §1396r(b)(1)(A);

j.      By failing, as a custom and policy, to care for patients like Katherine Schlaybach, in a manner and environment that maintained and enhanced her dignity as required by 42 C.F.R. §483.15 and 42 U.S.C. §1396r(b)(1)(A);

k.      By failing, as a custom and policy, to care for patients like Katherine Schlaybach, in a manner and environment that maintained and enhanced her dignity as required by 42 C.F.R. §483.15 and 42 U.S.C. §1396r(b)(1)(A);

l.      By failing, as a custom and policy, to develop a comprehensive care plan for residents such as Katherine Schlaybach as required as required by 42 C.F.R. §483.20 and 42 U.S.C. §1396r(b)(2)(A);

m.      By failing, as a custom and policy, to provide for residents such as Katherine Schlaybach the care and service to allow her to maintain her well-being as required as required by 42 C.F.R. §483.25 and 42 U.S.C. §1396r(b)(3)(A);

n.      By failing, as a custom and policy, to provide for residents such as Katherine Schlaybach to periodically review and revise written care plans by an interdisciplinary team after each patient assessment the care and service to allow her to maintain her well-being as required as required by 42 U.S.C. §1396r(b)(3)(A) and (b(2)(C).

o.      By failing, as a custom and policy, to provide for residents such as Katherine Schlaybach, and to conduct an assessment of a resident after a significant change in the physical or mental condition of the patient as required as required by 42 U.S.C. §1396r(b)(3)(A), (b) (3) (C) (i) (ii);

p.      By failing, as a custom and policy, to provide for residents such as Katherine Schlaybach, and to use assessment results to develop an updated care plan as required as required by 42 U.S.C. §1396r(b)(3)(D);

q.      By failing, as a custom and policy, to provide for residents such as Katherine Schlaybach the care and service to allow her to maintain her well-being as required as required by 42 C.F.R. §483.45 and 42 U.S.C. §1396r(b)(4)(ii);

r.      By failing, as a custom and policy, to provide for residents such as Katherine Schlaybach and to ensure that the personnel responsible for the care of Mrs. Schlaybach were properly certified and qualified to perform the necessary nursing services as required by 42 U.S.C. §1396r(b)(4)(B);

s.      By failing, as a custom and policy, to provide for residents such as Katherine Schlaybach, by failing to provide sufficient numbers of staff, including nursing, to ensure her safety, and to allow her to maintain her well-being as required as required by 42 C.F.R. §483.35 and 42 U.S.C. §1396r(b)(4)(C);

t.      By failing, as a custom and policy, to provide for residents such as Katherine Schlaybach, by failing to maintain clinical records of all patients such as Mrs. Schlaybach, including plans of care and risk assessments for matters such as falling as required by 42 U.S.C. §1396r(b)(6)(C);

u.      By failing, as a custom and policy, to ensure that Berks Heim Facility was administered in a manner that enabled it to use its resources effectively to allow patients to maintain their well-being required as required by 42 C.F.R. §483.75 and 42 U.S.C. §1396r(d)(A), (d) (1) (C);

v.      By failing, as a custom and policy, to provide for residents such as Katherine Schlaybach, and by failing to ensure that the administrator of Berks Heim, Terrance Brennan, met all standards of care as required by 42 U.S.C. §1396r(f) (4) and (d) (1) (C);

w.      By failing, as a custom and policy, to provide for residents such as Katherine Schlaybach, and by failing to ensure that the administrator of Berks Heim, Terrance Brennan, and the Director of Nursing properly monitored and supervised subordinate staff for the benefit of the health and safety of Katherine Schlaybach as required by 42 U.S.C. §1396r(a) (W) and 42 C.F.R. 483.75

Although "[t]he Third Circuit has held that a municipality or county can be sued under § 1983 for violations of the FNHRA,"[13] *Estate of Will v. Neshaminy Manor, Inc.*, No. 11-CV-5482, 2013 WL 1187085, at *7 (E.D. Pa. Mar. 21, 2013) (citing *Grammar v. John J. Kane Reg'l Centers–Glen Hazel,* 570 F.3d 520, 529 (3d Cir.2009)), like any other Section 1983 claim against a municipality, a plaintiff must still establish that the injury was the direct result of a municipal policy or custom.  Here, Plaintiff's allegations pertaining to statutory and regulatory violations are insufficient to support a Section 1983 claim for Defendants' alleged conduct. With the exception of perhaps subparagraphs (a) and (b), the above allegations are, on the whole,

---

[13]     That is, FNHRA creates rights the violation of which are remediable through Section 1983.

inherently conclusory.  Even accepting the several non-conclusory allegations as true, "the occurrence of a[n FNHRA] violation, standing alone, is not enough for *Monell* liability; the question is whether that violation is part of a municipal policy or custom."  *Hope v. Fair Acres Geriatric Ctr.*, 174 F. Supp. 3d 880, 888 (E.D. Pa. 2016).  The SAC is devoid of any specific facts that would support an inference that it was Defendants' custom or policy to violate FNHRA and that this custom or policy resulted in the decedent's injury and subsequent death.  *See Thomas*, 312 F. Supp. 3d at 453-54 (finding allegations to be conclusory where they alleged a nursing home "failed to comply with more than twenty separate provisions of the FNHRA and/or its regulations," including that the home "fail[ed], as a custom or policy, to develop a comprehensive care plan for patients . . . as required by 42 C.F.R. § 484.30 and 42 U.S.C. § 1369r(b)(2)," and "fail[ed], as a custom and policy to provide sufficient nursing staff to provide . . . services that would allow patients or residents . . . to attain or maintain the highest practicable, physical, mental, and psychological well-being, as required by 42 C.F.R. § 483.30 and 42 U.S.C. § 1396r(b)(4)(c)").

Finally, to the extent Plaintiff is attempting to base a Section 1983 claim on a policy or custom established by Terrence Brennan, who the SAC alleges was "required to create approve and implement policies and procedures for the care and treatment of the residents of Berks Heim Nursing and Rehabilitation," SAC ¶ 73, there is no support for such a claim.  The allegations against Brennan are limited to the allegation just quoted, as well as the allegation that Brennan "set in motion a series of events that they knew or reasonably should have known would cause Defendants' staff to deprive Plaintiff's decedent of her federally protected rights," *id*. ¶ 69, and that he, in addition to other staff, "failed, refused and/or neglected to perform" duties required of

them, *id.* ¶ 16.  Like the SAC's other allegations, these allegations are inherently conclusory and lack any specific factual substance.

Because the Court has determined that Plaintiff has failed to sufficiently plead the existence a municipal policy or custom, his Section 1983 claim fails as a matter of law.  In the absence of a municipal policy or custom, the Court need not, and in fact cannot, engage in the remainder of the inquiry—*i.e.*, whether a municipal policy or custom deprived the decedent of a right secured by the Constitution or federal law.  Plaintiff's claim pursuant to 42 U.S.C. § 1983 is dismissed.

### C.     Leave to Re-Plead

The Court has previously determined that Plaintiff's negligence and wrongful death claims are not viable due to Defendants' immunity.  Since the other counts of the SAC do not assert independent causes of action, the finding that Plaintiff's Section 1983 claim also fails leaves no causes of action upon which Plaintiff's suit can proceed.  However, the Court is obliged to consider whether to grant Plaintiff leave to re-plead some or all of his claims.  *See Kanter v. Barella*, 489 F.3d 170, 181 (3d Cir. 2007) ("Generally, a plaintiff will be given the opportunity to amend her complaint when there is an asserted defense of failure to state a claim.").  Although leave to amend pleadings, when not as of right, should be "freely give[n] when justice so requires," FED. R. CIV. P. 15(a)(2), the denial of leave to amend is appropriate where there exists undue delay, bad faith, dilatory motive, or futility.  *See Holst v. Oxman*, 290 F. App'x 508, 510 (3d Cir. 2008).

Here, the Court finds that allowing Plaintiff to re-plead his claims would be futile.  As discussed, his state law claims—negligence and wrongful death—fail as a matter of law as a result of Defendants' immunity under the Pennsylvania Tort Claims Act.  There are no additional

facts that could revive these claims.  With respect to the only remaining cause of action—Plaintiff's Section 1983 claim—there have been no facts alleged capable of supporting an inference that the decedent's injuries and subsequent death were caused by a municipal policy or custom.  The absence of any such allegations leads the Court to conclude that there likely exist no such facts.  This conclusion is particularly warranted in view of the fact that the SAC is the *third* iteration of Plaintiff's Complaint.  To allow Plaintiff a fourth bite at the apple would, in the absence of any indication that his claims might become viable, be injudicious.  *See Kanter*, 489 F.3d at 181 ("Where an amended pleading would be futile, that alone is sufficient ground to deny leave to amend.").

## V.       CONCLUSION

For the reasons discussed above, Defendants' motion to dismiss is granted.  The Second Amended Complaint is dismissed, with prejudice.  A separate Order follows this Opinion.

BY THE COURT:

*/s/ Joseph F. Leeson, Jr.*
JOSEPH F. LEESON, JR.
United States District Judge